793 P.2d 548

CITY OF FLAGSTAFF, a municipal corporation, and Linda Butler, in her capacity as City Clerk of the City of Flagstaff, Petitioners,

v.

Hon. Richard K. MANGUM, Judge of the Superior Court of the State of Arizona, In and For the County of Coconino; and Jacque Sullivan and K. Joseph Nackard, as taxpayers and electors on behalf of Citizens for Responsible Spending, a campaign committee, real parties in interest, Respondents.

Jacque SULLIVAN and K. Joseph Nackard, taxpaying electors of the City of Flagstaff, for themselves and on behalf of the Citizens for Responsible Spending, a campaign committee, Petitioners,

v.

Hon. Richard K. MANGUM, Judge of the Superior Court of the State of Arizona, In and For the County of Coconino; City of Flagstaff, a municipal corporation and political subdivision of the State of Arizona; and Linda Butler, City Clerk for the City of Flagstaff, acting in her official capacity, the real parties in interest, Respondents.

No. CV–89–0420–SA.

Supreme Court of Arizona,
En Banc.

May 31, 1990.

As Modified on Grant of
Reconsideration July 5, 1990.

Joseph R. Bertoldo, Flagstaff City Atty., and Hufford, Horstman, McCullough & Mongini, P.C. by Patrice M. Horstman, Flagstaff, for City of Flagstaff and Linda Butler.

Mangum, Wall, Stoops & Warden by Paul L. Brinkmann and Robert W. Warden, Flagstaff, for Jacque Sullivan and K. Joseph Nackard on behalf of Citizens for Responsible Spending.

Shelley & Behea by J. LaMar Shelley, Mesa, for amicus curiae Ariz. League of Cities and Towns.

## OPINION

MOELLER, Justice.

### JURISDICTION

▆ These two special actions present questions concerning the timeliness of the filing of local initiative petitions and the method of calculating the number of valid signatures on such petitions. The trial court found the petitions to be timely filed, but lacking sufficient valid signatures to require placement on the ballot. Relief by appeal is inadequate because normal appellate procedure would result in delay beyond the scheduled election. *See King v. Superior Court,* 138 Ariz. 147, 149–50, 673 P.2d 787, 789–90 (1983). The questions presented involve issues of law with statewide significance. *See Summerfield v. Superior Court,* 144 Ariz. 467, 469, 698 P.2d 712, 714 (1985). Therefore, we accepted jurisdiction of the special actions pursuant to Ariz. Const. art. 6, § 5(4), and Rule 1, Ariz. R.P.Sp.Act., 17B A.R.S. We permitted the League of Arizona Cities and Towns to file an *amicus curiae* brief because the issues in this case are recurring and have been the subject of controversy in cities and towns throughout Arizona. *See* Rule 7(f), Ariz.R.P.Sp.Act., 17B A.R.S. and Rule 16, Ariz.R.Civ.App.P., 17A A.R.S.

### ISSUES PRESENTED

1. In the absence of controlling local law, what is the filing deadline for local initiative petitions?

2. If local initiative petitions are untimely filed as to the targeted election, are they nevertheless valid for a later election?

3. In the absence of controlling local law, does the Arizona Constitution require signatures on initiative petitions of fifteen percent of those who voted for mayor at the last election or fifteen percent of those eligible to vote?

4. What is the proper procedural method for calculating the number of valid sig-

natures on initiative petitions under A.R.S. § 19–121 *et seq.?*

### FACTS

In November 1987, the Flagstaff City Council enacted an ordinance levying a two percent tax on the gross revenues of hotels, motels, campgrounds, bars and restaurants. On August 7, 1989, Jacque Sullivan, on behalf of the Citizens for Responsible Spending (Citizens), obtained an initiative petition seeking to eliminate what has become known as the "bed, board and booze tax."

On November 21, 1989, Citizens tendered the petition to the city clerk for filing and for presentation to the city council pursuant to A.R.S. § 19–143. The city clerk refused to accept and file the petition, stating that the petition was not timely as an initiative petition because it was not filed four months prior to the March 6, 1990 election, as required by Ariz. Const. art. 4, pt. 1, § 1(4). The clerk also rejected the petition as a referendum petition because it was not filed within thirty days after passage of the challenged ordinance as required by A.R.S. § 19–142.

Citizens then filed a special action in superior court, seeking an order compelling the clerk to accept the petition and present it to the council, and to place the initiative measure on the March 6, 1990 ballot. Citizens also sought a ruling that the required fifteen percent of qualified electors be determined by applying the percentage to the number of votes *cast* in the last mayoral election, rather than to the number of persons *qualified* to vote.

The trial court held that the petition was timely because, in the absence of a controlling City Charter provision, A.R.S. § 19–143(A) mandated a ninety-day filing deadline. The trial court also held that under Ariz. Const. art. 4, pt. 1, § 1 the required number of signatures was fifteen percent of all persons qualified to vote, not just fifteen percent of those who voted at the last mayoral election.[1]

---

1. The trial court also ruled that the petition was an initiative, rather than a referendum, based on *Hamilton v. Superior Court,* 154 Ariz. 109, 741 P.2d 242 (1987). That ruling is not challenged here.

The City filed a special action with this court seeking review of the timeliness issue. Citizens also filed a special action in this court seeking review of the issue of the required number of signatures. For reasons previously stated, we accepted jurisdiction of both special actions and consolidated them.

Following oral argument, we entered an order finding that the four-month period of Ariz. Const. art. 4, pt. 1, § 1(4) applied. Thus, the initiative petition was untimely filed for the March 6, 1990 election. However, we permitted the trial court to proceed to determine the number of valid signatures submitted. In addition, we asked the parties to brief the question of whether, assuming enough valid signatures were submitted, the initiative proposal should be placed on a later ballot. The trial court completed its determination of the number of valid signatures and the parties submitted their supplemental briefs. This opinion follows our initial order.

## DISCUSSION

### I. Filing Deadline

 Citizens contend the trial court correctly determined that, in the absence of any controlling local provision, A.R.S. § 19–143(A) provides a ninety-day filing deadline preceding the next election. Our analysis of the applicable constitutional and statutory provisions, however, leads us to conclude that the four-month period prescribed in the state constitution controls in this case.

The powers of initiative and referendum as to local matters are reserved to the qualified electors of cities, towns and counties. Ariz. Const. art. 4, pt. 1, § 1(8). These municipalities "may prescribe the manner of exercising said powers within the restrictions of general laws." *Id.; see also Maxwell v. Fleming*, 64 Ariz. 125, 128, 166 P.2d 831, 833 (1946) (initiative power under Charter must be exercised within limitations imposed by constitution and general laws). Accordingly, we must first examine the general laws of the state to determine whether the state legislature

prescribed a filing deadline for local initiative petitions.

Citizens argue that A.R.S. § 19–143(A) provides a filing deadline of ninety days preceding the next election. The statute states:

If an ordinance, charter or amendment to the charter of a city or town is proposed by initiative petition, it shall be filed with the city or town clerk, who shall submit it to the voters of the city or town at the next ensuing election held therein not less than ninety days after it was first presented to the city or town council. The council may enact the ordinance or amendment and refer it to the people or it may enact the ordinance or amendment without referring it to the people, and in that case it is subject to referendum petition as other ordinances. The mayor shall not have power to veto either of such measures.

A.R.S. § 19–143(A).

We read this statute not as a deadline for filing initiative petitions, but as a measure providing in part for a mechanism by which the municipal legislative authority can enact the proposal without the necessity of an election. The statute also designates the person with whom the petitions shall be filed (the clerk) and prevents placement of the measure on the ballot at any election held *less* than ninety days after the clerk presents it to the council. The section further provides that the city may enact the proposed ordinance or amendment either with or without referral to the voters but precludes mayoral veto. The statute implicitly contemplates that the petition must be presented to the clerk *more* than ninety days prior to the election.

In contrast to A.R.S. § 19–143(A) dealing with local initiatives, A.R.S. § 19–142(A), dealing with local referenda, provides a clear filing deadline by stating "the petition shall be filed with the city or town clerk within thirty days after passage of the ordinance." Where the legislature uses a term within one statute and excludes it from another, the term usually will not be read into the provision from which it was excluded. *See Board of Regents v. Public*

*Safety Ret. Fund Mgr.*, 160 Ariz. 150, 157, 771 P.2d 880, 887 (Ct.App.1989). Because a filing deadline was specifically included in § 19–142(A) for referendum petitions, but was not specifically included in § 19–143(A) for initiative petitions, we will not read a filing deadline into § 19–143(A).

Finding no filing deadline in A.R.S. § 19–143(A) or other general statutes, we look next to the Charter of the City of Flagstaff which, in turn, refers us back to the constitution and to state laws. The Charter provides:

> The provisions of the Constitution and the general laws of the State, as the same now exists or hereafter may be amended, governing the initiative and referendum and recall of elected officers, shall apply to the use thereof in the City.

City of Flagstaff Charter, art. 10, § 1.

Because the City Charter refers to state law, we are led to A.R.S. § 19–141(C) which provides a "gap-filler" regarding the local initiative process:

> The procedure with respect to municipal legislation shall be as nearly as practicable the same as the procedure relating to initiative and referendum provided for the state at large.

Regarding filing deadlines for statewide initiatives, article four of the constitution provides:

> All petitions submitted under the power of the Initiative shall be known as Initiative petitions, and shall be filed with the Secretary of State not less than four months preceding the date of the election at which the measures so proposed are to be voted upon.

Ariz. Const. art. 4, pt. 1, § 1(4).

Because no controlling local provision exists, the effect of A.R.S. § 19–141(C) is that the four-month provision of the constitution controls. *Cf.* 74–5–L Op. Att'y Gen. 1, 2–7 (1974) (ninety day provision of A.R.S.

§ 19–143(A) conflicts with four-month deadline of Ariz. Const. art. 4, pt. 1, § 1, and constitutional provisions control). Accordingly, the clerk properly rejected the petition as untimely for the March 6, 1990 election because it was not filed four months prior to that election.

## II. Effect of Untimely Filing with Respect to Later Elections

 Citizens argue alternatively that, even if the petition was untimely filed for the March 6, 1990 election, the initiative measure should be submitted to the voters at a later election. Citizens base their argument on provisions of the City Charter and on A.R.S. § 19–143(A).

Citizens contend that because the City Charter does not limit the council to placing an initiative measure at only primary or general elections, the measure should be submitted to the voters at a special election. *See* City of Flagstaff Charter, art. 9, § 1(a), (b), (c), (d).[2] Accordingly, Citizens posit that although the petition is untimely for the March 6, 1990 general election, it is timely for placement on the ballot at a special election to be called by the city council, to be held concurrently with the statewide November general election or at some other reasonable time. Citizens also base their argument, in part, on A.R.S. § 19–143(A), which provides that the city clerk shall submit the initiative petition to the voters "at the next ensuing election held therein." The "next ensuing election" under § 19–143(A), Citizens argue, is a term sufficiently expansive to include the November general election, a special election, or some other general city election.

Citizens' interpretation renders A.R.S. § 19–121(D) superfluous. That statute provides:

> (c) General elections shall be held for the purpose of electing a Mayor and the Council-members of the City, and such other purposes as the Council may prescribe.
>
> (d) All other municipal elections that may be held by authority of this Charter, or of any law, shall be known as Special Elections.

**2.** Regarding the types of elections, article nine of the Charter states:

(a) City elections shall be Primary, General, or Special.

(b) Primary elections shall be held for the purpose of nominating candidates for the General Election, and for such other purposes as the Council may prescribe.

Initiative petitions which have not been filed with the secretary of state as of five p.m. on the day required by the constitution prior to the ensuing general election after their issuance shall be null and void. . . .

A.R.S. § 19–121(D). Citizens contend that A.R.S. § 19–121(D) is inapplicable to municipal elections. However, as we have noted, general state statutes on initiatives indeed apply absent controlling local ordinances. To accept Citizens' argument would result in *no* effective deadline because *any* filing would be timely for *some* election. We hold that A.R.S. § 19–121(D) governs on local initiatives, absent a conflicting local ordinance. Under A.R.S. § 19–121(D), initiative petitions are null and void if not filed by 5:00 p.m. on the day required prior to "*the* ensuing general election after their issuance." (emphasis added). The petitions in this case were issued on August 7, 1989, and filed on November 21, 1989, less than four months prior to the March 6, 1990 general election. Therefore, the petitions are null and void by the express terms of the statute, and may not be considered for some other, later election.

## III. Definition of Qualified Electors

■ In light of our conclusion that the petitions were untimely filed and are now null and void, the two remaining issues presented are moot for this particular case. On occasion, however, we consider issues that are moot if significant questions of public importance are presented and are likely to recur. *See Fraternal Order of Police v. Phoenix Employee Relations Bd.*, 133 Ariz. 126, 127, 650 P.2d 428, 429 (1982); *see also Camerena v. Department of Public Welfare*, 106 Ariz. 30, 31, 470 P.2d 111, 112 (1970). Local elections and the rules governing them are of considerable public interest and justify departure from the usual mootness rule. Further, the remaining issues concerning the definition of qualified electors and the proper method of calculation of valid signatures recur and are the subject of differing interpretations. The issues were thoroughly briefed and presented in an adversarial fashion by the parties and by *amicus*, giving this court the benefit of the opposing arguments and considerations. For these reasons, we exercise our discretion to determine the merits of the two remaining issues notwithstanding the fact that those issues are moot in this particular case.

■ The trial court ruled that, for local initiative purposes, "qualified electors" under Ariz. Const. art. 4, pt. 1 means the entire number of persons *eligible* to vote at the last city election, rather than those who actually voted. As noted previously, the Arizona Constitution reserves the initiative power to "qualified electors" of cities, towns and counties. Ariz. Const. art. 4, pt. 1, § 1(8). Fifteen percent of the "qualified electors" within the municipality may propose local initiative measures. *Id.* "Until provided by general law, said cities and towns may prescribe the basis on which said percentages shall be computed." *Id.*

Based on *Adams v. Bolin*, 74 Ariz. 269, 247 P.2d 617 (1952), the City argues that the constitutional requirement of fifteen percent must be applied to all electors eligible to vote. *Adams* involved a legislatively proposed referendum which, if approved by the voters, would have repealed an initiative measure. The constitution provides that the "power of the legislature, to repeal . . . shall not extend to initiative . . . measures approved by a majority vote of the qualified electors." Ariz. Const. art. 4, pt. 1, § 1(6). In *Adams,* the court rejected the argument that "approved by a majority vote of the qualified electors" meant "approved by a majority of the qualified electors voting thereon" because "it is all too clear that the constitution makers knew the difference" between the two. 74 Ariz. at 273–74, 247 P.2d at 620.

The City's reliance on *Adams* is misplaced. For purposes of this case involving local initiatives, the constitution provides that "qualified electors" may be defined by municipalities until defined by general law. *See* Ariz. Const. art. 4, pt. 1, § 1(8). Accordingly, we first examine the general laws of the state to determine if the legislature has defined "qualified electors" for local initiative purposes.

For local referendum purposes, A.R.S. § 19–142(A) expressly defines "qualified

electors" as those voting in the preceding mayoral election. However, no general law defines "qualified electors" for local initiative petition purposes. With this void in the general law, we turn first to the City Charter. *See generally* I86–011 Op. Att'y Gen. 2 (1986) (where legislature fails to make provisions in general laws, cities free to choose basis to compute percentage of qualified electors for initiative petitions). However, as we have previously noted in connection with our discussion of filing deadlines, art. 10, § 1 of the Flagstaff City Charter refers us back to the state constitution and general state laws.

Turning back to state law, A.R.S. § 19–141(C) again provides a "gap-filler" in the absence of controlling local law and mandates that local initiative procedures be as consistent as possible with state initiative procedures. Therefore, we turn to the provisions relating to statewide initiative petitions.

Ariz. Const. art. 4, pt. 1, § 1(7) provides:

The whole number of votes cast for all candidates for Governor at the general election last preceding the filing of any initiative ... petitions on a state ... measure shall be the basis on which the number of qualified electors required to sign such petitions shall be computed.

Accordingly, we conclude that, in the absence of controlling local law to the contrary, the number of qualified electors required to sign a local initiative petition is fifteen percent of the entire vote cast for all candidates for mayor at the last preceding general municipal election.[3]

 In so holding, we are aware that in 1988 and 1989, the legislature considered, but did not pass, legislation that would expressly adopt a formula analogous to the one set forth in the constitution. *See, e.g.,* S.B. 1249, 39th Legis., 1st Sess. (1989) (bill held in committee); H.B. 2236, 38th Legis., 2d Sess. (1988) (bill stricken). The City notes that the legislative history

and historical background of *an enacted statute* provides guidance in ascertaining the intent of the legislature. *Dupnik v. MacDougall,* 136 Ariz. 39, 42, 664 P.2d 189, 192 (1983); *State v. Barnard,* 126 Ariz. 110, 112, 612 P.2d 1073, 1075 (Ct.App.1980). Citizens correctly point out that this principle has no application to *proposed,* but unenacted, legislation. Rejection by the house or senate, or both, of a proposed bill is an unsure and unreliable guide to statutory construction. *See Allen v. Retirement Sys.,* 769 P.2d 1302, 1306 (Okla.1988) (bills falling short of passage never probative of legislative intent). Indeed, one could also argue that the legislature considered the proposed legislation unnecessary. We will not speculate on the intent of the legislature in failing or refusing to adopt clarifying amendments on this issue. Absent constitutional infirmities, we are required to apply statutes as written. *In re Pima County Juvenile No. 74802-2* (Ariz. Apr. 4, 1990).

IV. Calculation of Number of Valid Signatures Under A.R.S. § 19–121.04

 The final issue we determine is the proper procedure for calculating the number of valid signatures. As previously noted, Flagstaff's Charter, art. 10, § 1, refers such questions to state law. All signatures obtained by unauthorized circulators are invalidated by A.R.S. § 19–114, which provides:

No county recorder or justice of the peace, and *no person other than a qualified elector shall circulate an initiative* or referendum *petition and all signatures verified by any such person shall be void* and shall not be counted in determining the legal sufficiency of the petition.

(emphasis added).

In this case, persons who were not qualified electors circulated and verified some of the petitions. To determine the proper number of valid signatures, A.R.S. § 19–121.01 provides that the secretary of state shall first count the total number of signatures presented and issue a temporary receipt for that number, assuming it

---

**3.** Amicus points out in its brief in support of the City's motion for reconsideration that some cities do not provide for direct election of may-

ors. This opinion is limited to those cities that do have such direct election.

appears to be a sufficient number. The method by which ineligible signers and ineligible circulators are to be determined is specified in A.R.S. § 19–121.02:

A. [T]he secretary of state shall, at random, select five per cent of the signatures filed with each petition for verification of eligibility by the county recorder of the county in which the persons signing the petition claim to be qualified electors.... [T]he secretary of state shall also have reproduced a facsimile of:

1. Each signature sheet on which a signature or signatures selected for random sampling appears and shall [transmit] ... such facsimiles to the county recorder....

2. Each affidavit of circulator as it appears on each signature page and shall [transmit] ... such facsimiles ... to the county recorder....

Subsection B of A.R.S. § 19–121.02 then defines the duties of the county recorder after receiving the facsimile signatures of voters from the random sample and the facsimiles of all circulators' signatures:

B. [T]he county recorder shall return such facsimile signature sheets ... to the secretary of state ... accompanied by the county recorder's certification stating:

1. The names, as well as the actual number, of persons selected by the secretary of state for verification by the county recorder found not to be qualified electors as of the date of signing the petition.

2. Whether the person whose facsimile signature appears in execution of each affidavit of circulator was a qualified elector at the time of circulating the petition.

The form of certification issued by the county recorder to the secretary of state is set forth in A.R.S. § 19–121.02(C).

Having obtained the information concerning the ineligible signers and ineligible circulators from the county recorder, the secretary of state is to employ the procedure set forth in A.R.S. § 19–121.04(A) to calculate the number of valid signatures. The application of this statute, in dispute in this case, provides:

[T]he secretary of state shall subtract from the number of signatures contained in the temporary receipt ... all signatures included in the random sample ... found to be ineligible, and shall, after determining the percentage of signatures found to be invalid in the random sample, subtract a like percentage of all other signatures included on the petitions and all signatures appearing upon signature sheets circulated by persons who, as certified by the respective county recorders, were not qualified electors at the time they circulated the petition. The secretary of state shall also subtract all signatures appearing on signature sheets of the petition circulated by persons who were county recorders or justices of the peace at the time they circulated the petition.[4]

A.R.S. § 19–121.04(A).

The City contends proper application of the statute in this case results in the following calculations:

City's Calculation

| | | |
|---|---|---|
| Total Signatures Submitted | | 3,623 |
| Random Sample (5% multiplied by 3,623) | 182 | |
| Signers in Sample not Qualified Electors | 87 | |
| Percentage of Sample Invalid (87 divided by 182) | 47.8% | |
| Less Invalid Sample Signatures | | <87> |
| | | 3,536 |
| Less Invalid Signatures by Like Percentage (3,536 multiplied by 47.8%) | | <1,690> |
| | | 1,846 |
| Less All Signatures Obtained by Unqualified Circulators | | <1,259> |
| Total Valid Signatures | | 587 |

**4.** The last sentence of this statute is inapplicable in this case because no petitions were circulated by county recorders or justices of the peace.

Citizens, on the other hand, contend that the proper application of the statute in this case yields the following calculations:

Citizens' Calculation

| | | |
|---|---|---|
| Total Signatures Submitted | | 3,623 |
| Random Sample (5% multiplied by 3,623) | 182 | |
| Signatures in Sample Obtained by an Unqualified Circulator | <46> | |
| | 136 | |
| Signers in Remainder of Sample not Qualified Electors | 62* | |
| Percentage of Sample Invalid (62 divided by 136) | | |
| | 45.6% | |
| Less All Signatures Obtained by Unqualified Circulators | | <1,259> |
| | | 2,364 |
| Less Invalid Sample Signatures | | <62> |
| | | 2,302 |
| Less Invalid Signatures by Like Percentage (2,302 multiplied by 45.6%) | | <1,049> |
| Total Valid Signatures | | 1,253 |

* This number, 62, is less than the number 87 which appears in both the City and the Court's calculations. This is because 25 persons in the sample were "doubly" ineligible, *i.e.*, they were ineligible voters who signed a petition circulated by an ineligible circulator.

---

The trial court accepted the City's method as appropriate. Although the City's method performs the calculations in the precise, literal order set forth in A.R.S. § 19–121.04(A), such an application gravely distorts the end result because the number of signatures on petitions circulated by unqualified persons are not subtracted until the end of the calculation. Consequently, many ineligible signatures are counted twice and, therefore, deducted twice. Under the City's method, the projected percentage of invalid signatures based on the random sample is first applied to all signatures submitted (less the number of invalid signatures in the random sample). Having done this, the City's method nevertheless still subtracts from the remaining figure all signatures submitted (whether otherwise "good" or "bad" signatures) that were verified by unqualified circulators.

The distortion against the proponents of the initiative is apparent. In case of an extremely high projected percentage of ineligible signers, the City's method of calculation could result in the projection of a negative number of valid signatures, a patent absurdity.

The method of calculation proposed by Citizens, however, also deviates from the statute and its intent. Citizens' method ignores the statutory requirement that the projected percentage of invalid signatures be based on a random sample of five percent of the total signatures submitted. The sample used by Citizens is not five percent; it is five percent reduced by the number of signatures that are invalid by reason of the ineligibility of the circulator.

We find that the statute in question seeks to accomplish two separate functions.

One function is to exclude *all* signatures found on petitions circulated by unauthorized persons, *i.e.*, unqualified electors, county recorders, and justices of the peace. For this purpose, all affidavits of circulators must be examined to determine the eligibility of the circulator. The second function of the statute is to authorize a method whereby a random sample of five percent of all signatures submitted may be used to project the likely number of ineligible signatures. Bearing in mind these dual statutory goals, we do not believe that either the City's method or Citizens' method is entirely consistent with the statute and its intent. The City's method exaggerates the projected number of ineligible signers while Citizens' method does not comply with the statute's random sampling requirement.

We believe the proper method of calculating valid signatures is as follows:

Court's Calculations

| | | |
|---|---|---|
| Total Signatures Submitted | | 3,623 |
| Random Sample (5% multiplied by 3,623) | 182 | |
| Signers in Sample not Qualified Electors | 87 | |
| Percentage of Sample Invalid (87 divided by 182) | 47.8% | |
| Less All Signatures Obtained by Unqualified Circulators | | <1,259> |
| | | 2,364 |
| Less Invalid Sample Signatures | | < 87> |
| | | 2,277 |
| Less Invalid Signatures by Like Percentage (2,277 multiplied by 47.8%) | | <1,088> |
| Total Valid Signatures | | 1,189 |

In some cases an additional calculation will be necessary in order to deduct withdrawn signatures. *See* A.R.S. § 1–261. No withdrawn signatures are involved in this case.

We believe this method fairly carries out the dual functions of the statute. Additionally, this interpretation of the statute is consistent with A.R.S. § 19–121.04(B) and (D), which specify the form of certified statements issued by the secretary of state after determining the number of valid signatures. *See generally* A.R.S. § 19–121.04(B), (D) (certified statement first lists number of invalid signatures due to an unqualified circulator; then lists number of signatures found invalid in random sample; finally lists number of projected invalid signatures).

We recognize that the method we have set forth will still result in a percentage of the invalid signatures in the random sample being deducted twice. However, such deduction appears clearly mandated by the statute. We note, however, that the calculations set forth in A.R.S. § 19–121.04 result merely in a *projected* number of valid signatures.[5] Any citizen may challenge the legal sufficiency of a petition. *See, e.g.*, A.R.S. § 19–121.03 (any citizen may challenge certification made by county recorder pursuant to § 19–121.02); A.R.S. § 19–122(A) (any citizen may challenge refusal of secretary of state to file petition or transmit facsimiles of signature sheets or affidavit of circulators); A.R.S. § 19–122(C) (any citizen may bring action to enjoin secretary of state from certifying or printing ballot where petition not legally sufficient). We believe the method of calculation set forth herein harmonizes the various statutory provisions, furthers the dual statutory purposes noted, and pre-

**5.** If the projection of valid signatures is at least 105% of the minimum required, the secretary of state notifies the governor that the initiative is placed on the ballot. A.R.S. § 19–121.04(B). If the projection falls between 95% and 105%, the secretary of state orders examination and verification of each signature. A.R.S. § 19–121.04(C). If the projection is less than 95%, the petitions are returned to those who submitted them. A.R.S. § 19–121.04(D).

vents unfairness to those supporting an initiative measure.

## CONCLUSION AND DISPOSITION

In the absence of controlling local provisions, local initiative petitions must be filed not less than four months preceding the next local general election. Petitions untimely filed pursuant to this constitutional deadline are null and void for inclusion on any ballot. The petitions in this case were untimely filed.

In the absence of controlling local provisions, the number of votes actually cast for mayor at the preceding election, rather than the number of voters eligible to vote, is the basis for computing the number of signatures required for a local initiative petition. The correct procedural method for calculating valid signatures on an initiative petition under A.R.S. § 19–121.04 is as set forth herein.

Citizens requested attorney's fees under A.R.S. § 12–2030. The court may award fees to a party prevailing on the merits in an action brought against a political subdivision or officer to compel the performance of a duty imposed by law. *See* A.R.S. § 12–2030(A). Because Citizens has not prevailed, we deny its request for attorney's fees.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and CORCORAN, JJ., concur.